IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00716–EWN–MEH


MORELAND PROPERTIES, LLC,
a Colorado limited liability company,

      Plaintiff,

v.

CITY OF THORNTON, a municipal
corporation,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is a civil rights case. Plaintiff Moreland Properties, LLC, alleges that Defendant City of Thornton violated its Fourteenth Amendment right to procedural due process by, *inter alia*, enacting an ordinance that deprived it of certain uses of its land without providing adequate process. Plaintiff additionally seeks a declaratory judgment that Defendant's ordinance is *ultra vires* and void, although (as discussed below) its current briefing effectively subsumes its request for a declaratory judgment into its procedural due process claim. This matter is before the court on "City of Thornton's Motion for Summary Judgment," and "Plaintiff's Motion for Interlocutory Summary Judgment on Liability," both filed on December 6, 2007. Jurisdiction is proper pursuant to 28 U.S.C. § 1331.

# FACTS

## 1. Factual Background

### a. Defendant's City Code and Procedures for Changing Zoning Classifications

On June 20, 1967, the City of Thornton, Colorado, adopted a home rule charter (the "Charter") pursuant to article XX, section six of the Colorado constitution which is included in the Thornton city code (the "Code") and which provides for a city council (the "Council") consisting of nine members. (Mem. Br. in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶¶ 1–3 [filed Dec. 6, 2007]; *admitted at* Pl.'s Resp. Br. to Thornton's Mem. Br. in Supp. of Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Statement of Undisputed Material Facts [hereinafter "RSOF"] ¶¶ 1–3 [filed Dec. 28, 2007].) The Charter requires that, in all legislative matters coming before it, the Council shall act only by ordinance, resolution, or motion, and recites that a majority of the members of the Council in office shall be a quorum for the transaction of Council business. (*Id.*, SOF ¶¶ 4–5; *admitted at* Pl.'s Resp., RSOF ¶¶ 4–5.) With respect to the passage of ordinances, the Charter provides:

> An ordinance may be introduced at any regular or special meeting and shall be read in full at the time it is introduced or, in cases where copies of the ordinance are available to the Council . . . said ordinance may be read by title only. It may be passed on first reading by the affirmative vote of not less than a majority of the members elected to the Council at the meeting at which it is introduced.

(*Id.*, SOF ¶ 7; *admitted at* Pl.'s Resp., RSOF ¶ 7.) With respect to posting and publication of ordinances, the Charter provides:

The full text of each ordinance after passage on first reading and before second reading and final passage, and after second reading and final passage, shall be posted in six (6) public places in the City as such places are designated by resolution of the Council. The title of each ordinance and a statement that the ordinance is on file in the City Clerk's office for public inspection shall be published in a newspaper legally qualified for City publications as provided in the Charter after first passage and before second [passage] and again after second and final passage.

(*Id.*, SOF ¶ 8; *admitted at* Pl.'s Resp., RSOF ¶ 8.)

Defendant's development code — which addresses zoning and land development issues — is set forth in chapter eighteen of the Code, and provides that zoning amendments shall be initiated as follows:

(1) The Council or the City staff may propose amendments to this chapter or request changes in a zoning district classification or boundary. The City staff shall deliver or cause to be delivered a proposed amendment to this chapter for a change in a zoning district classification or boundary to the Council with staff recommendation.

(2) A person may request a change in the zoning district classification or boundary by filing an application with the Director on a form furnished by the City.

(*Id.*, SOF ¶¶ 9–10; *admitted at* Pl.'s Resp., RSOF ¶¶ 9–10.) The development code further provides that Council review and action on amendments to chapter eighteen and/or zoning district changes shall be subject to the following:

(1) An amendment to this chapter may be proposed by Council or City Staff. A request for a change in zoning district classification or boundary requires the director to give notice of the public hearing in a newspaper of general circulation in the community at least ten days before the hearing.

(2) The District shall send proper notice of a public hearing on a request for a change in zoning district classification or boundary to the proper owner of record and all owners of real property lying within 600 feet of the boundary of the area of the request.

\*       \*       \*

(4)      The Council shall hold a public hearing on a request for a change in a zoning district classification or boundary. The Council is not required to hold a public hearing on an amendment to this Chapter.

(5)      An amendment to this chapter or request for a change in a zoning district classification or boundary shall be approved by the favorable vote of a majority of the quorum of the Council.

(*Id.*, SOF ¶ 11; *admitted at* Pl.'s Resp., RSOF ¶ 11.) The development code encourages persons considering application for a development permit "to contact the Director and discuss the proposal with the Department." (*Id.*, Ex. A-2, Part 2 at 10 [Code].)

### b.    *Defendant's 1993 Annexation and Zoning of the Disputed Property*

In 1993, Defendant enacted an ordinance approving the annexation of approximately twenty acres of property generally located at the southeast corner of 144th Avenue and I-25 in Adams County. (Pl.'s Corrected Opening Br. in Supp. of Mot. for Interlocutory Summ. J. on Liability [hereinafter "Pl.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 1 [filed Dec. 7, 2007]; *admitted in relevant part at* City of Thornton's Br. in Opp. to Pl.'s Corrected Mot. for Interlocutory Summ. J. [hereinafter "Def.'s Resp."], Resp. to Statement of Undisputed Facts [hereinafter "RSOF"] ¶ 1 [filed Jan. 14, 2008].) That same ordinance approved "regional commercial" zoning for the property which, under the Code, includes "auto service center" and "vehicle display, sales, and service" as permitted uses, and "vehicle display, sales and service" as permitted uses by right. (*Id.*, SOF ¶ 2; *admitted in relevant part at* Def.'s Resp., RSOF ¶ 2.) A permitted use by right under the Code is a use that does not require a specific use permit or a temporary use permit. (*Id.*, SOF ¶ 3; *admitted in relevant part at* Def.'s Resp., RSOF ¶ 3.)

### c.      Plaintiff's 1999 Purchase of a Portion of the Disputed Property

In 1999, Plaintiff purchased a portion of the property annexed in 1993.  (*Id*., SOF ¶ 4; *admitted in relevant part at* Def.'s Resp., RSOF  ¶ 4.)  Plaintiff purchased the property because its zoning classification allowed automobile dealerships and auto sales as permitted uses by right.  (*Id*., SOF ¶ 8; *deemed admitted in relevant part at* Def.'s Resp., RSOF  ¶ 8.)[1]  More specifically, Douglas Moreland, a well-known figure in the automobile dealership and automobile sales industry in the Denver metropolitan area, (*id*., SOF ¶ 5; *deemed admitted in relevant part at* Def.'s Resp., RSOF  ¶ 5), believed there would be extensive growth of the Denver metropolitan area to the north along I-25 and determined, with consultants, that the southeast corner of 144th Avenue and I-25 would be a prime location for an automobile dealership, ( *id*., SOF ¶¶ 6–7; *deemed admitted in relevant part at* Def.'s Resp., RSOF ¶¶ 6–7.) Moreover, prior to Plaintiff's purchase of the property, Mark L. Von Engeln, a representative and agent of Plaintiff, confirmed that the property's zoning classification allowed automobile dealerships and automobile sales as permitted uses by right by reviewing the Code and by speaking with somebody — probably in Defendant's planning department — whose name Mr. Von Engeln could not remember.  (*Id*., SOF ¶ 9; *admitted in relevant part at* Def.'s Resp., RSOF ¶ 9; *see also id.*, Ex. 5 at 2 [Von Engeln Dep.].)  Mr. Von Engeln further testified that, at the time of the acquisition, Plaintiff's plan was to develop an automobile dealership on the property or to

---

[1]Defendant proffers no evidence that this fact is not true, responding simply "that this is what Mr. Moreland testified to during his deposition."  (Def.'s Resp., RSOF ¶ 8.)  I accordingly deem this fact — and all similar facts Defendant fails to rebut with competent evidence — to be admitted, and discuss such evidence in greater detail below as it becomes relevant.

resell the property. (*Id.*, Ex. 5 at 3 [Von Engeln Dep.].) Mr. Moreland similarly testified that, on the day of the closing, he told two business partners that the land was "a great future development or resale property" because of its zoning. (*Id.*, Ex. 4 at 14 [Moreland Dep.].) A real estate transfer declaration Plaintiff filed with Adams County stated that the sale was "contingent upon the preapproval and exclusive right to a dealership point by the manufacturer." (*Id.*, SOF ¶ 11; *admitted at* Def.'s Resp., RSOF ¶ 11.)

### d. Defendant's Adoption of the North Washington Subarea Plan

In 2001, Defendant and the City of Westminster contracted with land use and urban design consultants to prepare a study of the I-25 corridor in the area bounded by Huron Street to the west, Washington Street to the east, 148th Avenue to the north, and 120 Avenue to the south. (*Id.*, SOF ¶ 13; *admitted at* Def.'s Resp., RSOF ¶ 13.) Within Thornton, this area was designated the North Washington Subarea ("NW Subarea") and includes the property Plaintiff purchased in 1999. (*Id.*) During 2004 and 2005, Defendant held approximately twenty-four public meetings to receive input, develop concepts, weigh alternatives, and create recommendations regarding future land use in the NW Subarea. (*Id.*, SOF ¶ 14; *admitted at* Def.'s Resp., RSOF ¶ 14.) Mr. Von Engeln testified that he attended at least two of these meetings and followed-up with phone calls, in part "to make sure [Plaintiff's] uses were not eliminated." (*Id.*, Ex. 5 at 5 [Von Engeln Dep.].) On January 14, 2005, upon Plaintiff's request for confirmation of its zoning, Kevin Puccio, one of Defendant's planners, confirmed by email that Plaintiff's land was zoned "regional commercial." (*Id.*, SOF ¶ 19; *admitted at* Def.'s Resp., RSOF ¶ 19.)

On April 26, 2005, Defendant adopted the NW Subarea Plan, which was intended to provide a comprehensive vision for future development in the NW Subarea, with specific guidance for the type, intensity, and quality of future development. (Def.'s Br., SOF ¶ 18; *admitted at* Pl.'s Resp., RSOF ¶ 18.) Defendant thereupon approved seven ordinances that rezoned seven properties in the NW Subarea — totaling 373 acres — to "regional commercial." (Pl.'s Br., SOF ¶ 16 *admitted at* Def.'s Resp., RSOF ¶ 16.) Adoption of the NW Subarea Plan did not change the zoning district classification of Plaintiff's property, and the documents that led to the creation of the NW Subarea Plan nowhere mentioned automobile dealerships. (Def.'s Br., SOF ¶ 18; *admitted at* Pl.'s Resp., RSOF ¶ 18; Pl.'s Br., SOF ¶ 17 *admitted at* Def.'s Resp., RSOF ¶ 17.)

Between Plaintiff's 1999 purchase of the property and Defendant's 2005 adoption of the NW Subarea Plan, Plaintiff never submitted an application for development of the property to Defendant. (Def.'s Br., SOF ¶ 18; *admitted at* Pl.'s Resp., RSOF ¶ 18.) Nonetheless, from October 1999 to November 2001, and from September 2004 to September 2006, Mr. Von Engeln served as a seller's agent pursuant to listing contracts with Plaintiff. (*See* Pl.'s Resp., Ex. 36 ¶¶ 12–13, 26 [Von Engeln Aff.].)

**e.** ***Plaintiff's 2005 Efforts to Sell the Property to CarMax***

During the summer of 2005, Plaintiff received an inquiry from CarMax Auto Superstores ("CarMax") regarding purchase of the property for construction of an automobile sales center, and the two parties began negotiating a purchase agreement. (Pl.'s Br., SOF ¶¶ 22–23, *admitted at* Def.'s Resp., RSOF ¶¶ 22–23.) By December 2005, CarMax had contracted with Plaintiff to

purchase the property for $5,955,795.00. (*Id.*, SOF ¶ 24, *admitted at* Def.'s Resp., RSOF ¶ 24.)

The purchase agreement defines CarMax's "Contemplated Use" of the property as the

"development, construction, use and operation of the Property for the retail sale of new and used

automobiles, with appurtenant service and wholesaling," and provides CarMax 150 days from

the effective date of the agreement to "conduct any and all studies, tests, evaluations and

investigations, including . . . an evaluation by [CarMax] of the economic viability of [CarMax's]

intended development." (*Id.*, Ex. 18 at 2, 4 [Purchase Agreement].) The agreement provides

that, if "as a result of the Feasibility Studies or for any other reason, [CarMax] determines, in its

sole discretion, that the Property is not suitable for [its] intended purposes, then [CarMax] may

terminate [the] Agreement." (*Id.*, Ex. 18 at 3 [Purchase Agreement].)

On February 23, 2006, CarMax had a pre-application meeting with some of Defendant's

employees to discuss its proposed automobile sales and service center on Plaintiff's property.

(*Id.*, SOF ¶ 27, *deemed admitted at* Def.'s Resp., RSOF ¶ 27.) As Susan Connors, Defendant's

Planning Director, explains in her affidavit: "The City provides pre-application meetings as an

informal courtesy step in the application process to all citizens, applicants and representatives of

applicants. The meeting provides prospective applicants the opportunity to meet with City staff

to discuss a land use proposal before making a formal application submittal to the City." (Def.'s

Br., Ex. A-4 ¶ 7 [Connors Aff.].) Although Plaintiff contends — without evidentiary citation —

that CarMax scheduled this meeting "at least by February *10*, 2006," a February *14*, 2006, letter

from Defendant's employees to CarMax confirms the date of this February 23, 2006, meeting.

(*See* Pl.'s Resp., RSOF ¶ 29 [emphasis added], Ex. 37 at 1 [2/14/06 Letter].)

Meanwhile, also sometime in February 2006, while visiting a family member in Albuquerque, New Mexico, Ms. Connors visited a CarMax site and concluded "it wasn't the type of architecture that we were looking for in the [NW Subarea] . . . It wouldn't meet the standards that we were intending for that area."  (Pl.'s Br., SOF ¶ 28, *admitted at* Def.'s Resp., RSOF ¶ 28.)  Ms. Connors conveyed this impression to members of Defendant's planning department and to Jeff Coder, Defendant's Deputy City Manager for City Development.  (*Id.*, SOF ¶ 29, *deemed admitted at* Def.'s Resp., RSOF ¶ 29.)  Moreover, Jay Ruchti, one of Defendant's planners, recalled that during a staff meeting prior to February 23, 2006, Ms. Connors told the staff present about the CarMax dealership she had seen in Albuquerque, and expressed her concerns about the architecture.  (*Id.*, SOF ¶ 29, *deemed admitted at* Def.'s Resp., RSOF ¶ 29; *see also id.*, Ex. 20 at 2–3 [Ruchti Dep.].)

At the February 23, 2006, pre-application meeting, Steven Miller, one of Defendant's project managers, advised CarMax that development of the property would require a collector roadway to be built through the property to connect from an underpass at the interchange between I-25 and 144th Avenue to Grant Street.  (Def.'s Br., Ex. A-10 at 3 [Miller Dep.].)  Mr. Miller recalled telling CarMax that the path of the roadway was not necessarily defined and was open to design options.  (*Id.*)  Mr. Miller further testified that Gene Potter, his supervisor, told him that "the City wanted a roadway from the underpass through the property," and acknowledged in his deposition that the cost of constructing such a roadway is typically incurred by the developer.  (*Id.*; *see also* Def.'s Resp., Ex. A-13 at 2 [Miller Dep.].)  Mr. Miller stated that the collector roadway did not appear in Defendant's thoroughfare plan or its draft transportation

plan dated February 2006, and that he could not recall ever having seen "concept drawings" showing the road, although he surmised that such drawings "may exist." (Pl.'s Br., SOF ¶ 37; *deemed admitted in relevant part at* Def.'s Resp., RSOF ¶ 37; *see also id.*, Ex. 21 at 3, 7 [Miller Dep.].) Mr. Rutchi testified that he was surprised by the collector roadway requirement brought up by Mr. Miller at the meeting because he "wasn't aware that they basically were going to require such a connection." (*Id.*, SOF ¶ 38; *admitted in relevant part at* Def.'s Resp., RSOF ¶ 38.)

On February 28, 2006, CarMax notified Plaintiff that it was terminating the purchase agreement. (Def.'s Br., SOF ¶ 32; *deemed admitted in relevant part at* Pl.'s Resp., RSOF ¶ 32.)[2] A letter sent from James D. Thornton[3] to Plaintiff recites that: "[t]he proposed construction of the road makes the property unsuitable for CarMax's use, both from a configuration standpoint and a cost standpoint." (Pl.'s Br., Ex. 23 at 1 [2/28/06 Letter].) Douglas Moyers, CarMax's Vice President of Real Estate, confirmed that this was the reason behind CarMax's termination of the purchase agreement, and testified that he knew of no other reason for the termination. (*See id.*, Ex. 17 at 26 [Moyers Dep.].) Christopher Crowe, one of CarMax's real estate managers who

_____

[2]Plaintiff purports to deny Defendant's proffered fact that, "[o]n February 28, 2006 CarMax . . . exercised its option to terminate the Agreement," on the grounds that the purchase agreement was "not an option contract." (*Compare* Def.'s Br., SOF ¶ 32 *with* Pl.'s Resp., RSOF ¶ 32.) Nonetheless, as Plaintiff has proffered no evidence that the agreement was not terminated on this date, I deem this fact — and all similar facts denied by Plaintiff without competent evidentiary support — to be admitted.

[3]Deposition testimony suggests that Mr. Thornton is CarMax's real estate counsel. (*See, e.g.*, Pl.'s Br., Ex. 17 at 25 [Moyers Dep.].)

consulted with Mr. Moyers regarding whether to terminate the agreement, testified that he concluded that CarMax should terminate the purchase agreement due to: (1) the collector roadway; (2) concerns about the waterline loop; and (3) concerns about sewer drainage. (Def.'s Resp., Ex. A-14 at 3 [Crowe Dep.].) Mr. Crowe could not recall whether he made a recommendation to Mr. Moyers regarding whether to terminate the agreement, and stated that Mr. Moyers had the final say on that decision. (*Id.*)

CarMax's termination of the purchase agreement caused Plaintiff to lose both a $50,000 deposit made by CarMax, and the $5,955,795 sale of the property to CarMax. (Pl.'s Br., SOF ¶ 43; *admitted at* Def.'s Resp., RSOF ¶ 43.) It is undisputed that CarMax never submitted an application to Defendant for development of Plaintiff's property, and that, by the time Plaintiff entered into the agreement with CarMax, Plaintiff had not submitted such an application to Defendant itself. (Def.'s Br., SOF ¶¶ 34–35; *admitted at* Pl.'s Resp., RSOF ¶¶ 34–35.)

### f. *Defendant's March–April 2006 Adoption of the "Overlay Zone"*

In early March 2006, Ms. Connors prepared a draft ordinance amending the "regional commercial" zoning district, and a "council communication" to accompany the draft ordinance to the Council, which she believed she gave to Mr. Coder for review. (*See* Pl.'s Br., Ex. 13 at 3–4 [Connors Dep.].) Ms. Connors further testified that she "assumed" Mr. Coder had asked her to prepare the council communication, and noted that Jack Ethredge, Defendant's City Manager, may also have provided direction to Mr. Coder. (*See id.*, Ex. 13 at 8 [Connors Dep.].) The object of the proposed ordinance was to eliminate vehicle display, sales, and services as permitted uses within the "regional commercial" and "industrial" zoning districts, and the

ordinance would have applied across the entire city of Thornton, an area encompassing approximately thirty-nine square miles. (*See id.*, Ex. 24 at 6, 7–8 [Connors Dep.]; *see also id.*, Ex. 25 at 1 [Draft Ordinance and Communication] [noting that, under the draft ordinance, "[v]ehicle display, sales and service would no longer be allowed in the Regional Commercial (RC) or Industrial (I) Districts"].) Following discussions between Ms. Connors and Mr. Coder, someone decided not to present the draft ordinance amending the "regional commercial" zoning district to the Council. (*See id.*, Ex. 24 at 10 [Connors Dep.].)

Subsequently, Ms. Connors drafted a new ordinance, number 2944 ("Ordinance 2944"). (*See id.*) This ordinance sought to amend the Code by creating an "overlay zone" over the NW Subarea that would, among other things, provide various new "design requirements" for all development in the subarea, and create new "prohibited uses" within the area, including "automobile sales, service or storage except as allowed in designated auto parks and zoned as Planned Development." (Def.'s Br., Ex. A-1, Part 2 at 2–4 [Ordinance 2944].) Defendant admits that the Code nowhere contains a separate definition of "designated auto parks." (*See* Def.'s Resp., RSOF ¶ 53; *see also* Pl.'s Br., Ex. 13 at 15 [Connors Dep.] [admitting that "there are no standards for an auto park in the (Code)"].) Moreover, although Ordinance 2944 recites that its proposed changes "are in addition to the requirements of the underlying zoning district for a subject property and may supersede the zoning district requirements," (Def.'s Br., Ex. A-1, Part 2 at 1 [Ordinance 2944]), Ms. Connors affies that the ordinance creating the overlay zone "did not propose any changes to the zoning classifications or the boundaries of the NW

Subarea," and that, accordingly, "the zoning classification of [Plaintiff's] property remained Regional Commercial," (*id*., Ex. A-4 ¶ 5 [Connors Aff.]).

On March 24, 2006, Defendant posted notice of a regular public meeting of the Council to be held on March 28, 2006. (*Id*., SOF ¶ 40; *admitted at* Pl.'s Resp., RSOF ¶ 40.) The agenda for the meeting, attached to the notice, indicated that the Council would be considering "[a]n ordinance adding a new Section to the [Code] to create an overlay zone for the [NW Subarea] Plan (First Reading)." (*Id*., SOF ¶ 41; *admitted at* Pl.'s Resp., RSOF ¶ 41.) At the March 28, 2006, meeting, Ordinance 2944 was read by title and a motion to approve the ordinance on first reading was passed by a majority vote of the Council members present. (*Id*., SOF ¶ 46; *admitted at* Pl.'s Resp., RSOF ¶ 46.) The minutes of this meeting reflect that the Council members asked no questions of Ms. Connors and Mr. Ethredge — who had introduced the ordinance — and that no public comment on the ordinance was offered or received prior to its passage on first reading. (*See* Pl.'s Br., Ex. 27 at 2–6 [3/28/06 Minutes].)

On March 30, 2006, notice of approval of Ordinance 2944 on first reading was posted, and the ordinance itself was posted at six locations for ten days. (Def.'s Br., SOF ¶¶ 48–49; *admitted at* Pl.'s Resp., RSOF ¶¶ 48–49.) On April 6, 2006, notice of approval of the ordinance was published in the Northglenn-Thornton Sentinel by title. (*Id.*, SOF ¶ 50; *admitted at* Pl.'s Resp., RSOF ¶ 50.) This notice advised that Ordinance 2944, "adding a new section 18–203 to the [Code] to create an overlay zone for the [NW Subarea] Plan," would be considered for second reading and final passage at the April 11, 2006, regular Council meeting. (*Id.*, Ex. A-1, Part 4 at 1 [Sentinel Notice].) On April 7, 2006, Defendant posted notice of the April 11, 2006,

meeting. (*Id.*, SOF ¶ 52; *deemed admitted in relevant part at* Pl.'s Resp., RSOF ¶ 52.) The proposed agenda for this meeting attached to the notice indicated that the Council would take up the second reading of Ordinance 2944. (*See id.*, SOF ¶ 53; *admitted in relevant part at* Pl.'s Resp., RSOF ¶ 53.)

On April 11, 2006, Ordinance 2944 was introduced at the Council's regular meeting, read by title, and approved unanimously by the seven City Council members in attendance. (*Id.*, SOF ¶ 54; *admitted at* Pl.'s Resp., RSOF ¶ 54.) The minutes of this meeting indicate that there was no public comment on the ordinance. (*See id.*, Ex. A-1, Part 4 at 3 [5/11/06 Minutes], Ex. A-1, Part 5 at 5 [5/11/06 Minutes].) On April 12, 2006, notice of the ordinance, as passed on second reading, was posted at six public locations. (*Id.*, SOF ¶ 56; *admitted at* Pl.'s Resp., RSOF ¶ 56.) On April 20, 2006, notice was also published in the Northglenn-Thornton Sentinel. (*Id.*, SOF ¶ 57; *admitted at* Pl.'s Resp., RSOF ¶ 57.)

It is undisputed that eight properties within the NW Subarea are zoned "regional commercial," (Pl.'s Br., SOF ¶ 21, *admitted at* Def.'s Resp., RSOF ¶ 21), and Donald Elliot, Defendant's zoning expert, acknowledged that Ordinance 2944's restriction on the selling of cars affected eight property owners, (Pl.'s Br., Ex. 14 at 5 [Elliot Dep.]). Moreover, Mr. Elliot confirmed that six of the eight properties within the NW Subarea zoned "regional commercial" are "three, four, [or] five" times larger than Plaintiff's property, and range in size from approximately thirty to 120 acres. (*Id.*) Finally, Mr. Moreland testified that the size of Plaintiff's land — approximately nine acres — was too small to support an "auto park." (*Id.*, Ex. 4 at 15 [Moreland Dep.].)

With respect to Defendant's adoption of Ordinance 2944, Mr. Elliot concluded in his expert report that, "[w]hile the degree of notice was relatively typical for a large area overlay district, in my experience most cities would have allowed more opportunities for public comment prior to adoption." (*Id.*, Ex. 30. at 6 [Elliot Report].) In his deposition, Mr. Elliot clarified that many cities in Colorado have planning boards to provide additional citizen input on zoning changes such as overlay zones, but noted that such boards were not required by Colorado law in home rule cities. (*Id.*, Ex. 14 at 7 [Elliot Dep.].) Messrs. Moreland and Von Engeln testified that Plaintiff did not learn about Ordinance 2944 until May 23, 2006. (*Id.*, SOF ¶ 65; *admitted in relevant part at* Def.'s Resp., RSOF ¶ 65.)

### g. *Plaintiff's May and August 2006 Attempts to Develop the Property*

After Ordinance 2944 was adopted, Plaintiff contacted Defendant to schedule a pre-application meeting to discuss proposed development of its property as a single automobile dealership. (Def.'s Br., SOF ¶ 62; *admitted at* Pl.'s Resp., RSOF ¶ 62.) Specifically, on May 23, 2006, Mr. Von Engeln sent a letter to Defendant stating:

> On behalf of [Plaintiff], I am hereby submitting a site plan for the development of 9 acres of Regional Commercial zoned vacant land at the southeast corner of 144th & I-25. The intended use of the property is auto dealership. This is a "Permitted Use" within City of Thornton Zoning Code (Section 18-194 #8) "Vehicle display, sales and service".

(*Id.*, Ex. 32 at 1 [5/23/06 Letter].) That same day, one of Defendant's planning technicians sent Plaintiff a letter informing it that a pre-application meeting scheduled for June 1, 2006, was cancelled because the overlay zone rendered Plaintiff's proposed development "a prohibited use." (*Id.*, SOF ¶ 67; *deemed admitted at* Def.'s Resp., RSOF ¶ 67; *see also id.*, Ex. 33 at 1

[5/23/06 Letter].)  Mr. Von Engeln testified that, within a couple months of the cancellation of the pre-application meeting, he and Mr. Moreland met with Ms. Connors and were informed that Defendant would no longer require a collector roadway to be built through Plaintiff's property. (*Id.*, Ex. 5 at 7 [Von Engeln Dep.].)  Defendant admits that such a meeting occurred, (*see* Def.'s Resp., RSOF ¶ 68), but avers, based on Ms. Connors's affidavit, that the meeting occurred in September, and that Ms. Connors never discussed the collector roadway with Messrs. Moreland and Von Engeln, (*see id.*, Ex. A-15 ¶ 5 [Connors Aff.]).

In August 2006, Plaintiff scheduled a second pre-application meeting with Defendant to discuss using its property for a proposed retail/commercial development.  (Def.'s Br., SOF ¶ 64; *admitted at* Pl.'s Resp., RSOF ¶ 64.)  Although submitted in August 2006, the concept site plans for the development were completed in January 2005.  (*Id.*)  To date, Plaintiff has never submitted a development application to Defendant for the property.  (*Id.*, SOF ¶ 65; *admitted at* Pl.'s Resp., RSOF ¶ 65.)

## 2. *Procedural History*

On April 6, 2007, Plaintiff filed a complaint in this court.  (Compl. [filed Apr. 6, 2007].) On July 18, 2007, Plaintiff filed a third amended complaint, alleging that Defendant deprived it of its Fourteenth Amendment right to procedural due process when: (1) on February 23, 2006, its employees informed CarMax that Defendant's plans called for a collector roadway to be built through Plaintiff's property; (2) the Council enacted Ordinance 2944 without compliance with the notice and hearing requirements of the Code pertaining to zoning classification changes; and (3) on May 23, 2006, its employees advised Plaintiff that its intended development of the

property was prohibited by Ordinance 2944. (Third Am. Compl. ¶ 33 [filed July 18, 2007] [hereinafter "Compl."].) Plaintiff also sought declaratory judgment that Ordinance 2944 was "*ultra vires* and void" because it either: (1) violated the notice and hearing requirements of the Code; or (2) "failed to provide any process of any kind before depriving [Plaintiff] of the described permitted uses by right." (Compl. ¶¶ 41, 44.)

On December 6, 2007, Defendant moved for summary judgment, essentially arguing that: (1) Plaintiff does not have a protected property interest in the zoning of its land; (2) Plaintiff cannot establish that Defendant had an official policy or custom to deprive it of its due process rights; and (3) Ordinance 2944 is not "*ultra vires* and void" because the Code does not require personal notice prior to amendment of the development code. (Def.'s Br. at 18–40.) On December 28, 2007, Plaintiff responded. (Pl.'s Resp.) On January 22, 2008, Defendant replied. (City of Thornton's Reply Br. in Supp. of Mot. for Summ. J. [filed Jan. 22, 2008] [hereinafter "Def.'s Reply"].)

On December 6, 2007, Plaintiff moved for summary judgment as to liability only under Federal Rule of Civil Procedure 56(d)(2), essentially arguing that: (1) it had a protected property interest in the zoning classification of its land; (2) the alleged due process violation was caused by a custom or policy of Defendant; and (3) it received inadequate process with respect to the enactment of Ordinance 2944 both under the Code, and under constitutional standards. (Pl.'s Br. at 17–45.) On January 14, 2008, Defendant responded. (Def.'s Resp.) On February 1, 2008, Plaintiff replied. (Pl.'s Reply to City of Thornton's Br. in Opp'n to Pl.'s Corrected Mot. for

Interlocutory Summ. J. [filed Feb. 1, 2008] [hereinafter "Def.'s Reply"].)  These matters are fully briefed and ripe for review.

## ANALYSIS

### 1.    *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2008); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e)(2) (2008).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467,

1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.    *Evaluation of Claims*

Defendant and Plaintiff each claim entitlement to summary judgment on the alternate grounds that: (1) Plaintiff did or did not have a protected property interest in the zoning classification of its property; (2) Defendant did or did not allegedly deprive Plaintiff of its procedural due process rights pursuant to an official custom or policy; and (3) Ordinance 2944 did or did not provide Plaintiff with adequate process under either the Code, or constitutional standards. (*See* Def.'s Br. at 18–40; Pl.'s Br. at 17–45.) I assess each of these issues in turn.

### a.    *Plaintiff's Protected Property Interest in the Zoning Classification of Its Land*

Plaintiff brings its procedural due process claim under 42 U.S.C. § 1983 ("section 1983"), which provides a remedy for constitutional violations committed by individuals acting under color of state law. (*See* Compl. ¶¶ 25–37); 42 U.S.C. § 1983 (2006). Specifically, section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (2006). Defendant does contest that its relevant employees were state actors acting under color of state law. (*See* Def.'s Br., Def.'s Resp., Def.'s Reply.)

The Fourteenth Amendment states that no state shall "deprive any person of . . . property[] without due process of law."  U.S. CONST. amend XIV, § 1.  "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision . . . ."  *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).  To establish a procedural due process violation, Plaintiff must first establish that it has been deprived of a constitutionally protected property interest.  *See Boutwell v. Keating*, 399 F.3d 1203, 1211 (10th Cir. 2005).

"The Supreme Court has stated that property interests are not created by the Constitution, but by existing rules or understandings that stem from independent sources, 'such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Darr v. Town of Telluride*, 495 F.3d 1243, 1251 (10th Cir. 2007) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 [1972].)  Moreover, "[t]o create a property interest, the state-law rule or understanding must give the recipient 'a legitimate claim of entitlement to [the benefit].'"  *Id.* (quoting *Roth*, 408 U.S. at 577).  "[C]onstitutionally protected property interests are created and defined by statute, ordinance, contract, implied contract and rules and understandings developed by state officials."  *Nichols v. Bd. of County Comm'rs*, 506 F.3d 962, 970 (10th Cir. 2007) (citation and internal quotation marks omitted).

In the instant case, both parties cite *Eason v. Board of County Commissioners*, 70 P.3d 600 (Colo. Ct. App. 2003), for the proposition that "'Colorado law recognizes a protected property interest in a zoning classification when a specifically permitted use becomes securely vested by the landowner's substantial actions taken in reliance, to his or her detriment, on

representations and affirmative actions by the government.'"  (Pl.'s Br. at 27[quoting *Eason*, 70

P.3d at 605–06]; Def.'s Br. at 20–21 [quoting same].)  Despite apparently agreeing that this rule

of law controls whether Plaintiff had a protected property interest in the zoning classification of

its land,[4] the parties contest whether Plaintiff took "substantial actions" in detrimental reliance

on Defendant's "representations and affirmative actions" in order to permit its "specifically

permitted use[s]" of "auto service center" and "vehicle display, sales and service" to securely

vest.  (*Compare* Pl.'s Br. at 27–34, *with* Def.'s Br. at 21–25, 28.)  Moreover, because the

question of whether a zoning classification constituted a protected property interest under

Colorado law was a matter of first impression in *Eason*, *see* 70 P.3d at 605, and because no

subsequent case has fleshed out what constitutes "substantial actions" in reliance on government

actions or representations after *Eason*, this court turns to the facts in *Eason* itself, and to the facts

of the non-binding cases that *Eason* found persuasive, in determining when a specifically

permitted zoning use securely vests.

  In *Eason,* the Colorado Court of Appeals found that a landowner's specifically permitted

zoning use securely vested when the defendant's land use department told him by letter that his

proposed use of the land was permitted under applicable zoning ordinances, and, in reliance

upon this assertion, he: (1) paid $1,000 for a building permit; (2) purchased and installed over

one-hundred semi-trailers on his land; and (3) began operating a self-storage business.  *See* 70

---

   [4]As discussed below, Defendant also inconsistently argues that Colorado law has a *per se*
rule that zoning classification cannot constitute a protected property interest.  (*See* Def.'s  Br. at
20–21; Def.'s Resp. at 20–21; Def.'s Reply at 22.)

P.3d at 603, 606. Moreover, in reaching its new rule of law, the *Eason* court explicitly stated that it was "following the rationale of *Nasierowski* [*Brothers Investment Company v. City of Sterling Heights*, 949 F.2d 890 (6th Cir. 1991)]." *Id.* at 605. In *Nasierowski*, the Sixth Circuit found that a landowner's permitted zoning use securely vested when: (1) "he expressly conditioned the purchase of the property on his obtaining a favorable zoning opinion from the City;" and (2) "expended considerable money and effort drafting a site plan, submitting it to the City for preliminary approval, petitioning the City for a variance from the specific site plan requirements, and negotiating with the City's planners and engineers in an effort to resolve minor disputes over relatively insignificant matters." 949 F.2d at 897. Moreover, the *Nasierowski* court stated that, "[t]he acquisition of the land was, in and of itself, a *substantial* act undertaken upon the City's approval and affirmative encouragement of the proposal." *Id.* (emphasis in original). Finally, the *Eason* court cited a few additional cases that, while addressing the vesting of permitted zoning uses in far less depth, found them vested when: (1) a city represented to a landowner that his site plan conformed with existing zoning regulations by adopting his plan through ordinance; and (2) a landowner had a legal nonconforming use — a two-family home — that predated a subsequent zoning change. *See Buckeye Cmty. Hope Found. v. City of Cuyahoga Falls*, 263 F.3d 627 (6th Cir. 2001) *rev'd on other grounds by* 538 U.S. 188 (2003); *Norton v. Town of Islip*, 239 F.Supp. 2d. 264, 270 (E.D.N.Y. 2003).

In the instant case, Plaintiff essentially contends that it had a protected property interest in the zoning classification of its land because it: (1) purchased the land because of its zoning classification; (2) negotiated with CarMax for sale of the land under both parties' assumption

that automobile dealerships and automobile sales were permitted uses; (3) entered into real estate listing contracts with Mr. Von Engeln from 1999 to 2001 and from 2004 to 2006 to sell the land according to its zoning classification; (4) refrained to its detriment from selling the land from 2002 to 2004 while waiting for the interchange between I-25 and 144th Avenue to be built and thus to increase the value of its land; and (5) took actions in preparation of its cancelled pre-application meeting in May 2006. (*See* Pl.'s Br. at 31–33; Pl.'s Resp. at 19–31, 33–34.) Defendant, by contrast, essentially argues that Plaintiff did not have a protected property interest in the zoning classification of its land because: (1) its decision to purchase the property "was not based upon any promise by [Defendant] regarding the use of the property;" (2) it never took "any steps" to develop the property, such as submitting a development application to the city; (3) CarMax never relied on any representations by final policymakers regarding the development of the property or the requirement of a collector roadway, and any reliance CarMax can show cannot be ascribed to Plaintiff; and (4) Plaintiff's mere scheduling of the May 2006 pre-application meeting cannot show detrimental reliance. (Def.'s Br. at 21–25, 28; Def.'s Resp. at 22–27.) For the following reasons, I agree with Plaintiff.

First, as a factual matter, I find there is no genuine issue as to whether Plaintiff relied upon the "regional commercial" zoning classification — and, by implication, upon the availability of "auto service center" and "vehicle display, sales, and service" as permitted uses, and "vehicle display, sales and service" as permitted uses by right — when it purchased the its property in 1999. (Pl.'s Br., SOF ¶ 2; *admitted in relevant part at* Def.'s Resp., RSOF ¶ 2.) Mr. Moreland testified that he purchased the property because its zoning classification listed

automobile dealerships and automobile sales as permitted uses by right, and Defendant has proffered no evidence disputing this testimony. (*See* Pl.'s Br., SOF ¶ 8; Def.'s Resp., RSOF ¶ 8.) Similarly, Defendant offers no evidence refuting Mr. Von Engeln's testimony that, prior to Plaintiff's purchasing of the property, he confirmed that the its zoning classification allowed automobile dealerships and automobile sales as permitted uses by right by reviewing the Code, and by speaking with somebody — probably in Defendant's planning department — whose name Mr. Von Engeln could not remember. (*See* Pl.'s Br., SOF ¶ 9; *admitted in relevant part at* Def.'s Resp., RSOF ¶ 9; *see also id.*, Ex. 5 at 2 [Von Engeln Dep.].) Unrefuted testimony from Messrs. Von Engeln and Moreland further reflects that: (1) at the time of the acquisition, Plaintiff's plan was to develop an automobile dealership on the property or to resell the property, (*id.*, Ex. 5 at 3 [Von Engeln Dep.]); and (2) Mr. Moreland told two business partners that the land was "a great future development or resale property" because of its zoning, (*id.*, Ex. 4 at 14 [Moreland Dep.]). Finally, the fact that a real estate transfer declaration Plaintiff filed with Adams County states that the sale was "contingent upon the preapproval and exclusive right to a dealership point by the manufacturer" further reinforces the conclusion that Plaintiff bought the land in reliance upon its permitted use as an automobile dealership. (*See id.*, SOF ¶ 11; *admitted at* Def.'s Resp., RSOF ¶ 11.) In the face of this overwhelming evidence, Defendant makes no serious argument that Plaintiff did not rely upon the permitted uses of the land at the time of purchase, but instead advances the opaque two-sentence argument that: "[Plaintiff's] decision to purchase the Property was not based upon any promise by the City regarding the use of the property. At most, Plaintiff confirmed that the Property was zoned Regional Commercial, which

at the time, allowed vehicle sales and service as a use by right." (Def.'s Br. at 21–22.) Although Defendant does not deign to explain this argument, it appears to be premised upon the implicit assumptions that: (1) a defendant must affirmatively "promise" that a specific land is permitted in order for a plaintiff to rely on such a representation; and (2) confirmation of zoning classification alone — either through a published ordinance, or through personal confirmation of such classification by a city employee — cannot constitute a "promise."  To the extent that this is Defendant's argument, I disagree.  First, *Eason* requires only reliance upon a "representation[]" or an "affirmative action[]" by a defendant, and I find no reason to hold that such a representation or affirmative action must take the form of an affirmative "promise."  *See* 70 P.3d at 605–06; *see also Nasierowski*, 949 F.2d at 891 (finding reliance where "City officials responded favorably" to a landowner's pre-purchase inquiry about whether the proposed development was permitted, informing the landowner "that the parcel was situated within a . . . 'general business district' classification").  Second, even if an affirmative "promise" were required, I find no reason to hold that a published ordinance listing permitted uses could not constitute such a promise; if a landowner cannot rely upon a published zoning ordinance to determine what the permitted uses of his land are, it is hard to imagine what he can rely upon. Finally, I note that, even if a published ordinance may not constitute an affirmative representation or "promise," Mr. Von Engeln's vague, but nonetheless undisputed, testimony reflects that he received personal confirmation of the land's zoning classification by speaking with somebody — probably in Defendant's planning department — whose name Mr. Von Engeln could not remember.  (*See* Pl.'s Br., Ex. 5 at 2 [Von Engeln Dep.].)  I find that, semantic

subtleties notwithstanding, such confirmation alone could constitute an affirmative "promise" of the permitted uses of Plaintiff's land, assuming that such a promise is needed. Accordingly, I find Defendant's conclusory argument to be without merit, and hold that there is no genuine issue as to whether Plaintiff relied upon a "representation[]" or "affirmative action[]" of Defendant pertaining to the permitted uses of the land when it purchased the property in 1999. *Eason*, 70 P.3d at 605–06.

Second, as a legal matter, I find that Plaintiff's purchase of the property in reliance upon such a representation or affirmative action by Defendant constitutes a "substantial action[]" allowing the permitted uses under the "regional commercial" zoning classification to securely vest. The Sixth Circuit in *Nasierowski* stated that "[t]he acquisition of the land was, in and of itself, a *substantial* act undertaken upon the City's approval and affirmative encouragement of" a landowner's proposal, 949 F.2d at 897 (emphasis in orginal), and the *Eason* court explicitly stated that it was "following the rationale of *Nasierowski*," 70 P.3d at 605. Moreover, I find Defendant's attempts to read a different, superseding, rule of law into *Eason* unpersuasive. Defendant apparently contends that, regardless of whether it relied upon a zoning classification when it purchased the property, Plaintiff must have taken subsequent steps to develop its property in order for its permitted uses to securely vest. (*See, e.g.*, Def.'s Br. at 22.) This apparent contention, moreover, appears to stem from the fact that the landowner in *Eason* took such steps — *e.g.*, by obtaining a building permit, by purchasing semi-trailers for his land, and by starting his self-storage business before the zoning classification was changed. (*See id.*); *see also Eason*, 70 P.3d at 603, 606. While I agree that the *Eason* court found such facts sufficient

to demonstrate detrimental reliance, I disagree that it held them necessary to so demonstrate. Instead, *Eason* announced the generalized rule that: "Colorado law recognizes a protected property interest in a zoning classification when a specifically permitted use becomes securely vested by the landowner's substantial actions taken in reliance, to his or her detriment, on representations and affirmative actions by the government." 70 P.3d at 605–06. While a pre-existing owner's development of his land in accordance with zoning regulations may demonstrate detrimental reliance under this rule, so may a new owner's purchasing of land because of its zoning classification, as demonstrated by *Nasierowski*. *See* 949 F.2d at 897. Accordingly, I find Defendant's proffered evidence suggesting Plaintiff's alleged failure to "develop" the property subsequent to its purchase — *e.g.*, by failing to submit a development application to the city — insufficient to disprove Plaintiff's detrimental reliance upon representations or affirmative actions by Defendant.

Moreover, in a similar vein, I find much of Plaintiff's additional evidence independently sufficient to demonstrate beyond factual dispute that Plaintiff detrimentally relied upon the zoning classification of its land. Whether or not Plaintiff may properly invoke any reliance by CarMax, and irrespective of whether Plaintiff's scheduling of its May 2006 pre-application meeting with Defendant suggests any detrimental reliance, the unrefuted evidence demonstrates that: (1) Mr. Von Engeln served as a seller's agent pursuant to listing contracts with Plaintiff from September 2004 to September 2006, (*see* Pl.'s Resp., Ex. 36 ¶¶ 12–13, 26 [Von Engeln Aff.]); (2) on January 14, 2005, Plaintiff received email confirmation from Mr. Puccio that its land was zoned "regional commercial," (Pl.'s Br., SOF ¶ 19; *admitted at* Def.'s Resp., RSOF ¶

19); (3) in December 2005, Plaintiff contracted with CarMax to sell its land for approximately six million dollars after being contacted by CarMax in the summer of 2005, (*id.*, SOF ¶¶ 22–24, *admitted at* Def.'s Resp., RSOF ¶¶ 22–24); and (4) the purchase agreement between Plaintiff and CarMax defines CarMax's "Contemplated Use" of the land as "development, construction, use and operation of the Property for the retail sale of new and used automobiles," (*id.*, Ex. 18 at 2, 4 [Purchase Agreement].)  These undisputed facts demonstrate that Plaintiff took "substantial actions" in reliance upon the zoning classification of its land — and, specifically, in reliance upon Mr. Puccio's confirmation of this classification in his January 2005 email to Plaintiff — by expending time, money, and effort in the fall of 2005 to negotiate a purchase agreement with CarMax anticipating CarMax's development of the property pursuant to its zoning classification. Accordingly, for the foregoing reasons, I find that Plaintiff has established a protected property interest in the zoning classification of its land relating to its purchase of the property and its dealings with CarMax.

In urging against the above conclusions, Defendant makes two additional arguments that need to be addressed.  First, as indicated above,[5] Defendant appears to suggest that there is a *per se* rule in Colorado that zoning classification cannot constitute a protected property interest. (*See, e.g.*, Def.'s Br. at 20 [claiming that "a property owner does not have a legal right to the continued maintenance or retention of the zoning governing his property"].)  Nonetheless, Defendant's only purported support for this proposition is a treatise on zoning law, which, in

---

[5]*See* note 6, *supra*.

turn, cites a Colorado Court of Appeals case that allegedly so holds.[6]  (*See id.*)  Defendant

provides no pinpoint citation within this allegedly relevant case, nor any discussion of this case,

and this court's independent review finds absolutely nothing therein that is even remotely

relevant to the supposed *per se* rule for which Defendant cites it.  *See Applebauch v. Bd. of*

*County Comm'rs*, 837 P.2d 304 (Colo. Ct. App. 1992) (addressing standards to be applied in a

city's assessment of a proposal to revert property to a prior zoning classification).  Moreover, the

court's review of the treatise Defendant cites demonstrates that the supposed rule of law it relates

derives from a 1954 Florida Supreme Court case that reached a holding directly contrary to the

holding of the Colorado Court of Appeals in *Eason*.  *See* EDWARD H. ZIEGLER, JR. ET AL., 3

RATHKOPF'S THE LAW OF ZOING AND PLANNING § 38:30 (4th Ed. 2008) (citing *City of Miami*

*Beach v. 8701 Collins Ave., Inc.*, 77 So. 2d 428, 430 [Fla. 1954] [holding that "(a) city will (not)

be estopped to enforce an amendment to a zoning ordinance merely because a party

detrimentally alters his position upon the change . . ."]).  The court admonishes Defendant for

what, charitably read, constitutes extreme sloppiness in reporting relevant law, and what, less

charitably read, appears to be a deliberate attempt to mislead this court as to substance of

controlling Colorado law.  Second, Defendant appears to argue that Plaintiff had no protected

property interest in the zoning of its land because Defendant had total discretion to amend its

---

[6]Defendant also provides two "*see also*" citations for this purported rule of law, but neither case is even vaguely on point.  Instead, both cases stand for the irrelevant proposition that a landowner does not have a *per se* vested right in the maintenance of his neighbor's zoning classification.  *See Glennon Heights, Inc. v. Central Bank & Trust*, 658 P.2d 872, 877 (Colo. 1983) (citing *Spiker v. Lakewood*, 603 P.2d 130, 133 [1979]).

zoning ordinances without notice or a hearing under its Code. (*See, e.g.*, Def.'s Br. at 18–19,

25–27.) I disagree. The cases Defendant cites for this alleged proposition actually address

whether a landowner may claim a property interest in the outcome of a municipal procedure for

determining land use, and hold that he may not so long as this procedures afford the municipality

enough discretion that the outcome is not determined *a priori* by adherence to the procedure.

*See, e.g.*, *JJR 1 LLC v. Mt. Crested Butte*, 160 P.3d 365, 369–71 (Colo. Ct. App. 2007) (finding

no property interest in the outcome of a building permit application procedure where the

procedure affords the municipality broad discretion to grant or deny the permit); *Hillside Cmty.*

*Church v. Olson*, 58 P.3d 1021, 1027–29 (Colo. 2002) (finding no property interest in outcome

of special use permit application hearing where the municipality had discretion to deny the

permit even after the hearing). In the instant case, Plaintiff does not argue that his property

interest derives from the procedure for amending zoning ordinances embodied in the Code, but

rather from the "regional commercial" zoning classification embodied in the Code. (*See, e.g.*,

Pl.'s Br. at 31–34; Pl.'s Resp. at 14). Consequently, Defendant's argument is a red herring

insufficient to affect my above-holding.

       **b.**    ***Defendant's Policy or Custom Causing Plaintiff Alleged Procedural Due***
                ***Process Violation***

Section 1983 liability cannot be predicated upon *respondeat superior*. *Brammer-Hoelter*

*v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211 (10th Cir. 2007). Instead, to establish

municipal liability, a plaintiff must show: (1) the existence of a municipal policy or custom

depriving it of a constitutional or statutory right; and (2) a direct causal link between the policy

or custom and the injury alleged. *See Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 385 [1989]).

A municipal policy is a "'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers.'" *Novitsky v. City of Aurora*, 491 F.3d 1244, 1259 (10th Cir. 2007) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 [1978]). "[U]nder appropriate circumstances, a single decision by policymakers can be sufficient to create liability under [section] 1983." *Brammer-Hoelter*, 492 F.3d at 1211 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 [1986]). As the Tenth Circuit has explained:

> While *Monell* found liability on the basis of an official policy as the moving force of the constitutional violation, it fell to the Court in *Pembaur* to establish that actions taken by a municipality's final policymakers also represent acts of official policy giving rise to municipal liability. . . . An act by a municipality's final policymaking authority is no less an act of the institution than the act of a subordinate employee conforming to a preexisting policy or custom. As the Court in *Pembaur* explained '[n]o one has ever doubted, for instance, that a municipality may be liable under [section] 1983 for a single decision by its properly constituted legislative body — whether or not that body had taken similar action in the past or intended to do so in the future — because even a single decision by such a body unquestionably constitutes an act of official government policy.'

*Simmons v. Unitah Health Care Special Dist.*, 506 F.3d 1281, 1285 (10th Cir. 2007) (quoting *Pembaur*, 475 U.S. at 480) (further internal citations and quotation marks omitted). The question of who is a "final policymaker" capable of creating liability by a single decision is a legal question to be determined by the court based on state and local law. *See Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 124 [1988].)

A municipal custom is "an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003) (citing *Bd. of County Commr's v. Brown*, 520 U.S. 397, 404 [1997]). To establish municipal custom, a plaintiff must prove: (1) the existence of a persistent and widespread practice of unconstitutional misconduct by municipal employees; and (2) deliberate indifference to or tacit approval of such misconduct by policymaking officials after notice of the conduct. *See, e.g.*, *Rost ex rel. K.C. v. Steamboat Springs RE-2 School Dist.*, 511 F.3d 1114, 1125 (10th Cir. 2008); *Gates v. Unified Sch. Dist. No. 449*, 996 F.2d 1035, 1041 (10th Cir. 1993).

In the instant case, Plaintiff never pins down its precise theory of municipal liability, but argues broadly that a "policy or custom" of depriving it of its procedural due process rights may be inferred from: (1) the February 23, 2006, pre-application meeting in which Defendant's employees told CarMax that Defendant would likely require a collector roadway to be built through Plaintiff's property; (2) Ms. Connor's March 2006 preparation of the draft ordinance amending the "regional commercial" zoning district after her visit to Albuquerque, and/or her alleged decision, possibly in conjunction with Messrs. Coder and/or Ethredge, to submit Ordinance 2944 rather than the draft ordinance to the Council; (3) the Council's March–April adoption of Ordinance 2944; (4) Defendant's May 23, 2006, cancellation of Plaintiff's scheduled pre-application meeting; and (5) Messrs. Moreland's and Von Engeln's meeting with Ms. Connors in which the latter allegedly informed them that Defendant would no longer be requiring a collector roadway to be built through Plaintiff's property. (*See* Pl.'s Br. at 18–25.)

Defendant, by contrast, essentially argues that it is not susceptible to municipal liability because: (1) the February 23, 2006, pre-application meeting was pre-decisional, and anything its employees may have said to CarMax could not have constituted final policy; (2) Ms. Connors's opinions regarding CarMax's architecture are immaterial cannot establish official policy; (3) the Council's adoption of Ordinance 2944 complied with notice provisions of the Code and did not reflect an official policy to deprive Plaintiff of its due process rights; and (4) cancellation of the June 1, 2006, pre-application meeting was a natural consequence of the adoption of Ordinance 2944.  (*See* Def.'s Br. at 29–35.)  For the following reasons, I find that Plaintiff has demonstrated an adequate basis of municipal premised upon policy, but not upon custom.

### i.    *Defendant's Municipal Liability Premised Upon Policy*

Plaintiff points to no "officially adopted policy statement, ordinance, regulation, or decision officially adopted and promulgated by [Defendant's] officers" to deprive it of its due process rights.  (*See* Pl.'s Br.; Pl.'s Resp.; Pl.'s Reply); *Novitsky*, 491 F.3d at 1259.  Accordingly, to show that Defendant can bear municipal liability premised upon policy, Plaintiff must point to one or more "single decision[s] by policymakers" that are independently sufficient to create section 1983 liability.  *See Brammer-Hoelter*, 492 F.3d at 1211; *see also Randle*, 69 F.3d at 447 (contrasting acts taken by subordinate employees in conformance with a preexisting unconstitutional policy with single unconstitutional acts taken by a municipality's final policymaking authority).  Moreover, Plaintiff must first establish that the actors behind the allegedly unconstitutional deprivations of its protected property interest were the "final policymakers" with respect to these deprivations.  *See Randle*, 69 F.3d at 447.  In determining

whether an official is a final policymaker within his area of authority, courts look primarily to two factors: (1) "whether his 'discretionary decisions are constrained by general policies enacted by others;" and (2) "whether those 'decisions are reviewable by others." *Milligan-Hitt v. Bd. of Trustees*, — F.3d —, 2008 WL 1795068, at *8 (10th Cir. Apr. 22, 2008) (quoting *Dill v. City of Edmond*, 155 F.3d 1193, 1211 [10th Cir. 1998].)

Despite Plaintiff's suggestion that Ms. Connors, Mr. Coder, and Mr. Ethredge were final policymakers with respect to zoning and development issues, (*see* Pl.'s Reply at 21–24), I find as a matter of law that the sole "final policymaker[]" with respect to these issues was the Council. *See Randle*, 69 F.3d at 447 (stating that the question of who is a "final policymaker" in a particular area is a legal question to be determined by the court ). Defendant is a home rule city, and the Colorado constitution grants such cities "broad legislative authority to draft and implement" charters and ordinances "regarding local and municipal matters." (Def.'s Br., SOF ¶ 1; *admitted at* Pl.'s Resp., RSOF ¶ 1); *City of Colorado Springs v. Securecare Self Storage*, 10 P.3d 1244, 1247 (Colo. 2000). Moreover, under Colorado law, zoning is categorized as a "local and municipal matter" governed by a city's charter and ordinances. *Securecare*, 10 P.3d at 1247. Defendant's Code recites that either the Council, City staff, or members of the public may request changes to the development code or to zoning district classifications, (*see* Def.'s Br., SOF ¶¶ 9–10; *admitted at* Pl.'s Resp., RSOF ¶¶ 9–10), but requires that actual changes "be approved by the favorable vote of a majority of the quorum of the Council," (*id.*, SOF ¶ 11; *admitted at* Pl.'s Resp., RSOF ¶ 11). Accordingly, I find that, as a matter of state and local law, the Council is Defendant's final policymaker with respect to zoning and development matters.

In arguing against the above conclusion, Plaintiff makes only weak legal and factual arguments. First, Plaintiff points to various provisions in the Code reciting that Ms. Connors, as Planning Director, is tasked with, *inter alia*, "implement[ing] the City's goals, policies, plans, and programs," and that Mr. Ethredge, as City Manager, is tasked with, *inter alia*, "see[ing] that all laws and ordinances are enforced." (Pl.'s Reply at 22.) I find such evidence ineffective to affect my above holding as these Code provisions clearly envision an executive, rather than legislative, role for Ms. Connors and Mr. Ethredge, and thus necessarily imply that any of their "discretionary decisions are constrained by general policies enacted by others," *i.e.*, the Council. *Milligan-Hitt*, 2008 WL 1795068, at *8 (internal quotation marks and citation omitted). Slightly more promisingly, Plaintiff also cites various provisions in the Code demonstrating that Ms. Connors and Mr. Ethredge, perhaps with the intermediation of Mr. Coder, are also tasked with recommending changes to the Council that they deem expedient. (*See* Pl.'s Reply at 22.) Nonetheless, I find such evidence unavailing as it remains undisputed that any such recommendations must be approved by the Council, (*see* Def.'s Br., SOF ¶ 11; *admitted at* Pl.'s Resp., RSOF ¶ 11), and thus that any decisions these individuals make with respect to proposed changes are "reviewable by others." *Milligan-Hitt*, 2008 WL 1795068, at *8 (internal quotation marks and citation omitted). Finally, Plaintiff suggests that the Council may just routinely ratify the recommendations of Ms. Connors and Mr. Ethredge, but offers no factual support for this suggestion. (*See* Pl.'s Reply at 25.) Instead, Plaintiff points only to the fact that the Council asked no questions of Ms. Connors and Mr. Ethredge prior to passing Ordinance 2944 on first

reading on March 28, 2006.[7]  (*See id.*)  Whatever this isolated fact may or may not say about the passage of Ordinance 2944, I find that it is insufficient to raise a triable issue of fact as to whether Council routinely ratifies the recommendations of Ms. Connors and Mr. Ethredge. Accordingly, for the foregoing reasons, I find Plaintiff's suggestion that Ms. Connors, Mr. Coder, and Mr. Ethredge were the "final policymakers" with respect to zoning and development issues to be without legal or factual support.

Because the Council is the sole "final policymaker" with respect to zoning and development issues, it follows that the Council's March–April 2006 passage of Ordinance 2944 is the sole candidate for demonstrating municipal liability on the basis of policy.  To establish municipal liability on the basis of a single act, Plaintiff must show: (1) that the act deprived it of a constitutional or statutory right; and (2) a direct causal link between the act and the injury alleged.  *See, e.g.*, *Graves*, 450 F.3d at 1218.  For the following reasons, I find that the Council passage of Ordinance 2944 was a "single decision by policymakers . . . sufficient to create liability under [section] 1983."  *Brammer-Hoelter*, 492 F.3d at 1211.

First, the Supreme Court stated in *Pembaur* that "[n]o one has ever doubted . . . that a municipality may be liable under [section] 1983 for a single decision by its properly constituted legislative body," 475 U.S. at 480, and it is difficult to imagine a single decision of the Council more germane to a procedural due process claim than the passage of an ordinance allegedly

---

[7]Plaintiff also points to Mr. Ruchti's testimony that he believes Ms. Connors and Mr. Coder are "mid management to upper management" and are "the people that [sic] basically directs [sic] development in the City."  (Pl.'s Reply at 24.)  I find that such opinion evidence irrelevant to analysis of state and local law.

without adequate process. Second, other courts have found single acts by municipalities that arguably violate procedural due process rights to constitute government policy capable of supporting municipal liability. *See, e.g.*, *Hillside Prod., Inc. v. Duchane*, 249 F. Supp. 2d 880, 892, 896 (E.D. Mich 2003) (finding planning commission's decision to revoke a plaintiff's land use permit after a hearing that lacked requisite neutrality and impartiality to constitute "an act of official government policy" sufficient to impose municipal liability); *Luedeke v. Village of New Paltz*, 63 F. Supp. 2d 215, 224 (N.D.N.Y. 1999) (finding a snow removal ordinance that permitted the assessment of fines and a lien against a plaintiff's property without affording him adequate opportunity to be heard to be a "municipal policy" sufficient to impose municipal liability). Based on such persuasive authority, I find that the Council's passage of Ordinance 2944 constituted a municipal policy allegedly depriving Plaintiff of a constitutional right to due process. *Graves*, 450 F.3d at 1218. Moreover, I also find that there was a direct causal link between this policy and Plaintiff's alleged injury because this policy constituted the injury. As the Supreme Court in *Board of County Commissioners v. Brown* explained:

> Where a plaintiff claims that a particular municipal action *itself* violates federal law . . . resolving these issues of fault and causation is straightforward. . . . [T]he conclusion that the action taken . . . by the municipality . . . itself violates federal law will also demonstrate that the municipal action was the moving force behind the injury of which the plaintiff complains.

520 U.S. at 404. Based on the foregoing, I find that Plaintiff has demonstrated an adequate basis of municipal liability on the basis of policy by pointing to the March–April 2006 passage of Ordinance 2944.

In contending against the above conclusion, Defendant makes two arguments that need to be addressed. First, Defendant proffers a question-begging argument that "there is nothing unconstitutional about a home rule City deciding to amend its development code to add an Overlay District which imposes additional use restrictions within the zoning classifications of the properties contained therein so long as the City complies with its code when the Ordinance is enacted." (Def.'s Br. at 34.) While I agree that there is nothing *per se* unconstitutional about such an action, such a conclusion says nothing about the constitutionality of the passage Ordinance 2944, which must satisfy both the requirements of the Code, and the dictates of constitutional due process.[8] *See, e.g.*, *Securecare*, 10 P.3d at 1247 (stating that a city may "adopt and draft its Zoning Code as it chooses so long as it conforms with constitutional limitations and the city's own charter and ordinances"). Second, Defendant argues that "no evidence exists to show that the adoption of Ordinance 2944 reflects an official policy or custom by [the Council] to specifically deny Plaintiff its procedural due process rights." (Def.'s Br. at 34.) While I agree that this is likely true,[9] I also find that it is irrelevant, as even a single unconstitutional act by a

_____

[8]I address below whether these dictates were satisfied. (*See* Analysis § 2cii, *infra*.)

[9]I must also note in this regard, however, that Defendant appears to also inconsistently argue in a separate part of its brief that the adoption of Ordinance 2944 did reflect a policy embodied in the Code because Defendant provided only such notice as was required for an amendment to the development code, as opposed to such notice as was required for a change to existing zoning district classifications or boundaries. (*See, e.g.*, Def.'s Reply at 42–44.) To this extent that this argument is true, I alternatively hold any provision or provisions in the Code permitted truncated process to accompany mere amendment to the development code would themselves constitute an adequate basis for municipal liability on the basis of policy. *See, e.g.*, *Ellis v. City of Montgomery*, 460 F. Supp. 2d 1301, 1312 (M.D. Ala. 2006) (finding that city's "policy and practice" of sending pre-demolition notice to property owners based on out-of-date records was sufficient to support municipal liability on a plaintiff's procedural due process claim

municipality may impose section 1983 liability. *See, e.g.*, *Simmons*, 506 F.3d at 1285 (noting that "'where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is taken only once or to be taken repeatedly'" [quoting *Pembaur*, 475 U.S. at 481]). Accordingly, for the foregoing reasons, I find that Defendant's arguments that the passage of Ordinance 2944 cannot support municipal liability are without merit.

### ii.     *Defendant's Municipal Liability on the Basis of Custom*

Plaintiff also argues that a municipal custom of depriving it of its due process rights may be inferred from the totality of the factual circumstances outlined *supra*. (*See generally* Pl.'s Br. at 18–25.) I disagree.

As noted above, to establish municipal custom, Plaintiff must prove: (1) the existence of a persistent and widespread practice of unconstitutional misconduct by municipal employees; and (2) deliberate indifference to or tacit approval of such misconduct by policymaking officials after notice. *Rost ex rel. K.C.*, 511 F.3d at 1125; *Gates*, 996 F.2d at 1041. Because I have found that the Council was Defendant's final policymaker with respect to zoning and development matters, it follows perforce that none of the alleged misdeeds outlined by Plaintiff above — save the passage of Ordinance 2944 — can constitute unconstitutional misconduct by municipal employees because none of these actions were legally competent to deprive Plaintiff of its protected property interest. Moreover, even if Plaintiff could overcome this hurdle, it has

---

alleging demolition of his house without adequate notice).

adduced no evidence that the Council had any notice of the allegedly unconstitutional misconduct of its employees. Instead, the closest Plaintiff comes to establishing such notice is Ms. Connors's deposition testimony that she "assumed" Mr. Coder had asked her to prepare her draft ordinance in early March 2006, and that Mr. Ethredge may also have provided direction to Mr. Coder. (*See* Pl.'s Br., Ex. 13 at 8 [Connors Dep.].) However, because Plaintiff has provided no evidence that the Council knew anything that Messrs. Coder or Ethredge allegedly knew, I find such evidence insufficient as a matter of law to suggest that Council had notice of any alleged unconstitutional acts of Defendants' employees.

Accordingly, based on the foregoing, I find that Plaintiff has proven an adequate basis of municipal on the basis of policy, but not on the basis of custom.

> c. ***Whether Defendant Provided Adequate Process in Connection with the Passage of Ordinance 2944***

Having determined that Plaintiff had a protected property interest in the zoning classification of its land, and that Defendant's enactment of Ordinance 2944 was an official policy competent to support municipal liability, I turn to whether Defendant provided adequate process in connection with the passage of Ordinance 2944. At the outset, I note that although Plaintiff's complaint sought a declaratory judgment that Ordinance 2944 was "*ultra vires* and void" because it either (1) violated the provisions of the Code, or (2) "failed to provide any process of any kind before depriving [Plaintiff] of the described permitted uses by right," (*see* Compl. ¶¶ 41, 44), Plaintiff has effectively abandoned its argument that Ordinance 2944 is *ultra vires* in its instant briefing. (*See* Pl.'s Br.; Pl.'s Resp.; Pl.'s Reply.) Instead, Plaintiff essentially

argues that the passage of Ordinance 2944 was *unconstitutional* because it violated Colorado law, and because it failed to satisfy constitutional due process. (*See, e.g.*, Pl.'s Br. at 34–45). Accordingly, I treat Plaintiff's slightly confused argument that Ordinance 2944 is "*ultra vires and void*" as actually addressing whether the passage of Ordinance 2944 satisfied constitutional due process, and reserve until trial the question of whether voiding the ordinance might be an appropriate remedy for such a violation.

To prove its due process claim, Plaintiff must prove that: (1) the passage of Ordinance 2944 amounted to a deprivation of its protected property interest; and (2) the deprivation occurred without due process of law. *See, e.g.*, *Eason*, 70 P.3d at 604 (citation omitted). I address each of these issues in turn.

### i. Whether the Enactment of Ordinance 2944 Amounted to a Deprivation of Plaintiff's Protected Property Interest

Without explicitly so arguing, Defendant hints at various points in its briefing that the enactment of Ordinance 2944 did not deprive Plaintiff of its protected property interest because: (1) this ordinance left the "regional commercial" zoning classification of Plaintiff's land intact while simply removing specific permitted uses and uses by right from this classification within the NW Subarea; and (2) the ordinance permitted Plaintiff to continue selling automobiles as part of a designated "auto park" zoned as Planed Development, and therefore did not divest it of any right. (*See, e.g.*, Def.'s Resp. at 48–49, 50; Def.'s Reply at 26–27, 37.) To the extent such arguments are seriously advanced, I find them unpersuasive.

First, Defendant's argument that Plaintiff retained the "regional commercial"

classification of its land elevates form over substance as Plaintiff's protected property interest

rested not in the nomenclature denominating its zoning classification, but rather in the bundle of

rights that this nomenclature delimited.  Thus, whether or not Plaintiff's land technically

remained zoned "regional commercial" after the enactment of Ordinance 2944 is irrelevant to

whether the passage of this ordinance deprived it of its protected property interest.  Second,

whether or not Ordinance 2944 permitted Plaintiff to still sell cars in designated "auto parks"

zoned Planned Development,[10] it undeniably deprived Plaintiff of other rights, including the right

to use its land for  "automobile sales, service or storage."  (*See* Def.'s Br., Ex. A-1, Part 2 at 2–4

[Ordinance 2944].)  Defendant inadvertently admits as much in its briefing by stating:

"Plaintiff's May 2006 pre-application meeting was cancelled because [Ordinance 2944] had

already been adopted by the City; therefore, Plaintiff's propose [sic] use of the Property as a

single car dealership was prohibited."  (Def.'s Br. at 35.)  Moreover, as Plaintiff deftly points

out, even if its erstwhile permitted uses were somehow still available under the "auto park"

provision of Ordinance 2944, it was still deprived of its protected property interest because:

> Prior to enactment of [Ordinance 2944], [Plaintiff] was permitted to construct an
> auto dealership by right on [its property].  It needed no permission to construct a
> dealership because the zoning district classification, Regional Commercial,

---

[10]I note in this regard that the Code nowhere contains a separate definition of "designated auto parks," (*see* Def.'s Resp., RSOF ¶ 53; *see also* Pl.'s Br., Ex. 13 at  15 [Connors Dep.] [admitting that "there are no standards for an auto park in the (Code)"]), and the only evidence pertaining to whether Plaintiff's land may be used as an "auto park" is Mr. Moreland's unrefuted testified that the size of Plaintiff's land — approximately nine acres — precluded such a use, (*see* Pl.'s Br., Ex. 4 at 15 [Moreland Dep.]).

allowed a single dealership as a use by right. . . . After the enactment of [Ordinance 2944], [Plaintiff] is allowed to construct an auto park on [its property] and such an auto park must go through [Defendant's] Planned Development process . . . which [entails] a rezoning of the property.

(Pl.'s Reply at 31–32.)  Because I agree, and find that the bundle of rights protected by the "regional commercial" zoning classification of Plaintiff's land included both Plaintiff's permitted uses and the permitted uses by right, I find that no reasonable fact-finder could conclude that Ordinance 2944 did not deprive Plaintiff of its protected property interest in the zoning classification of its land.

> ii.    *Whether Deprivation of Plaintiff's Protected Property Interest Occurred Without Due Process of Law*

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Stanko v. Maher*, 419 F.3d 1107, 1115 (10th Cir. 2005) (internal quotation marks and citation omitted).  "Time and again, the Supreme Court has made clear that 'some form of hearing is required before an individual is finally deprived of a property interest.'" *Lawrence v. Reed*, 406 F.3d 1224, 1233 (10th Cir. 2005).  The requirement of notice is "engrained" in the concept of due process, and "notice of a proceeding satisfies due process if it is 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Gurung v. Ashcroft*, 371 F.3d 718, 721 (10th Cir. 2004) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 [1950]); *see also Excel Corp. v. U.S. Dep't of Agri.*, 397 F.3d 1285, 1297 (10th Cir. 2005) (citation omitted).  To satisfy due process requirements, notice "be of such a

nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance." *Mullane*, 339 U.S. at 314.

In assessing a procedural due process claim, courts look to the three-factor balancing test articulated in *Mathew v. Eldridge*, 424 U.S. 319, 334–35 (1976). *See, e.g.*, *Ward v. Anderson*, 494 F.3d 929, 935 (10th Cir. 2007). As articulated by the Supreme Court in *Mathew*, this test contemplates:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. Nonetheless, as Tenth Circuit has "repeatedly emphasized," "the procedural due process analysis is not a technical conception with fixed content unrelated to time, place, and circumstances, but rather is flexible and calls for such procedural protections as the particular situation demands." *Ward*, 494 F.3d at 929 (citations and internal quotation marks omitted).

In the instant case, both parties make inapposite arguments pertaining to Plaintiff's due process claim. Plaintiff primarily contends that Defendant failed to provide adequate notice of the Council's consideration of Ordinance 2944 because the notice it did provide did not conform with "minimum notice requirements established under Colorado law." (*See* Pl.'s Br. at 41–43.) Defendant counters that, as a home rule city, Colorado notice provisions do not apply to it, and that the only notice requirements it must follow are those embodied in its Code. (*See, e.g.*,

Def.'s Br. at 36–38.) Moreover, Defendant contends that, based upon its reading of the Code,

neither "individualized notice [n]or a public hearing" were required prior to the passage of

Ordinance 2944 because this ordinance merely amended the development code, rather than

changing zoning district classifications or boundaries. (*Id*. [emphasis added].) As such, the bulk

of the parties' arguments are misdirected, because a procedural due process claim must be

assessed under federal law, irrespective of state or local requirements.[11] As the Tenth Circuit

recently noted in the face of similar arguments:

> For reasons that are opaque to us, both parties focus their procedural due process
> arguments on the provisions of the [state] statutes and [state] regulations that
> provide for hearings. They disagree whether the statutes and regulations require a
> hearing when, as in the instant case, the [state agency] does not plan to revoke or
> suspend a child care provider's license. . . . However, these arguments are a red
> herring; the question raised in a procedural due process challenge is whether the
> level of process afforded to the [plaintiffs] passed constitutional muster, not
> whether [the state agency] followed statutes or regulations. A failure to comply
> with state or local procedural requirements does not necessarily constitute a
> denial of due process; the alleged violation must result in a procedure which itself
> falls short of standards derived from the Due Process Clause.

*Ward*, 494 F.3d at 934–35 (internal citations and quotation marks omitted). I note, moreover,

that Defendant's dogged insistence that it need only follow the provisions of its Code, (*see, e.g.*,

---

[11]Defendant's argument may have some force in establishing that the passage of
Ordinance 2944 was not *ultra vires* by reason of alleged non-compliance with Colorado law, but
such a showing would secure a pyrrhic victory as Plaintiff claims that passage of this ordinance
violated both Colorado law and constitutional due process. (*See* Compl. ¶¶ 41, 44; Pl.'s Br. at
34–45.) Moreover, as indicated above, Plaintiff appears to have abandoned its argument that the
passage of Ordinance 2944 was *ultra vires*. Nonetheless, to the extent that Plaintiff still asserts
this argument, I find that, as a home rule city, Defendant was within its power under Colorado
law to pass Ordinance 2944 with whatever process it deemed appropriate, so long as this
procedure adhered to constitutional standards. *See, e.g.*, *Securecare*, 10 P.3d at 1247.

Def.'s Br. at 26–40; Def.'s Resp. at 46–47, 49–52; Def.'s Reply at 42–46), reflects an apparent

misconception that home rule municipalities are somehow exempt from constitutional

requirements. Whatever John Marshall might say about this suggestion, I need merely invoke

the authority of Colorado Supreme Court, which has observed that home rule municipalities may

adopt and its zoning codes so long as such codes comport with "with constitutional limitations

and the city's own charter and ordinances." *Securecare*, 10 P.3d at 1247.

For the following reasons, I find that Defendant's adoption of Ordinance 2944 failed to

comply with procedural due process. First, with respect to "the private interest that will be

affected by the official action," *Mathews*, 424 U.S. at 335, Plaintiff's interest in the maintenance

of its permitted uses and permitted uses by right under the "regional commercial" zoning

classification is significant. As discussed above, there is no genuine issue as to whether Plaintiff

relied upon this classification when it purchased the property in 1999, and during its dealings

with CarMax. (*See* Analysis, §2a, s*upra.*) Moreover, other courts have recognized that

restricting the commercial use of one's property constitutes a "weighty interest," *see*, *e.g.*,

*Eason*, 70 P.3d at 607, and the Supreme Court has acknowledged that restrictions on land use

which fall short of "complete, physical, or permanent deprivation of real property" are still

"significant" deprivations sufficient to trigger due process protections. *See Connecticut v.

Doehr*, 501 U.S. 1, 11 (1991) (finding the property interests affected by attachment of property

to be "significant" within a *Mathews* analysis).

Second, with respect to "the risk of an erroneous deprivation of such interest through the

procedures used, and the probable value, if any, of additional or substitute procedural

safeguards," *Mathews*, 424 U.S. at 335, I find that: (1) the risk of an erroneous deprivation of

Plaintiff's property interest was significant given the nature of the public, rather than personal,

notice of Ordinance 2944; and (2) the probative value of additional procedural safeguards would

have been substantial.[12]  The undisputed evidence demonstrates that: (1) on March 24, 2006,

Defendant posted notice of the Council's March 28, 2006, meeting, advising that the Council

would be considering "[a]n ordinance adding a new Section to [the Code] to create an overlay

zone for the [NW Subarea] Plan (First Reading)," (Def.'s Br., SOF ¶ 41; *admitted at* Pl.'s Resp.,

RSOF ¶ 41); (2) on March 30, 2006, Defendant posted notice of the Council's adoption of

Ordinance 2944 on first reading, along with the ordinance itself, at six locations for ten days,

(*id.*, SOF ¶¶ 48–49; *admitted at* Pl.'s Resp., RSOF ¶¶ 48–49); (3) on April 6, 2006, Defendant

published notice of the Council's adoption of the ordinance on first reading in the Northglenn-

Thornton Sentinel by title, advising that Ordinance 2944 would be considered for second reading

and final passage at the April 11, 2006, regular Council meeting, (*id.*, SOF ¶ 50; *admitted at* Pl.'s

Resp., RSOF ¶ 50; *see also id.*, Ex. A-1 Part 4 at 1 [Sentinel Notice]); and (4) on April 7, 2006,

Defendant posted notice of the April 11, 2006, meeting, advising that the Council would take up

the second reading of Ordinance 2944, (*id.*, SOF ¶¶ 52–53; *deemed admitted in relevant part at*

Pl.'s Resp., RSOF ¶¶ 52–53).  For the following reasons, I find that this notice was not "of such

---

[12]Moreover, I note that the risk of "erroneous" deprivation in this context must
necessarily refer to a deprivation occurring without providing opportunity for affected
landowners to voice their objections, whether or not these objections are ultimately heeded. *See,
e.g.*, *Ward*, 494 F.3d at 929 (noting that procedural due process "is flexible and calls for such
procedural protections as the particular situation demands").

a nature as reasonably to convey the required information" to Plaintiff that enactment of Ordinance 2944 might deprive it of its protected property interest in the zoning classification of its land. *Mullane*, 339 U.S. at 314.

The public notices posted on March 24, 2006, March 30, 2006, and April 7, 2006 — along with the April 6, 2006, notice published in the Northglenn-Thornton Sentinel — each merely indicated that the Council was considering "[a]n Ordinance adding a new Section to [the Code] to create an overlay zone for the [NW Subarea] Plan," (*see* Def.'s Br., Ex. A-1, Part 1 at 9 [3/24/06 Notice], Ex. A-1, Part 3 at 6 [3/30/06 Notice], Ex. A-1, Part 4 at 1 [Sentinel Notice], Ex. A-1, Part 4 at [5/7/06 Notice]), and none of these notices provided any indication that the ordinance might eliminate permitted uses under the "regional commercial" zoning classification, (*see id.*). Plaintiff argues that "[Defendant] had never before used an overlay district as a zoning tool," (Pl.'s Br. at 43), and Defendant does not refute this contention, (*see* Def.'s Resp.). As such, I find that the substance of these notices was not "'reasonably calculated, under all the circumstances, to apprise [Plaintiff]'" of the impending effective rezoning of its land because the notices included no language so indicating. *Gurung v. Ashcroft*, 371 F.3d at 721 (citation omitted); *see also Hallmark Builders and Realty v. City of Gunnison*, 650 P.2d 556, 559 (Colo. 1982) (holding that, under Colorado law, notice of a zoning ordinance amendments must, at a minimum, "apprise the public of the subject matter of the hearing and the nature of the proposed zoning change").[13]

---

[13]I cite *Hallmark* merely as persuasive authority as states are empowered to provide greater due process protections than are constitutionally mandated.

Moreover, the only indication in any of these notices that Ordinance 2944 might affect Plaintiff's protected property interest was the text of the ordinance itself, which was posted along with the public notices at six locations on March 30, 2006. (*See* Def.'s Br., SOF ¶¶ 48–49; *admitted at* Pl.'s Resp., RSOF ¶¶ 48–49). As a threshold matter, I note that Plaintiff could not have received adequate notice of the March 28, 2006, Council meeting which took up the ordinance on first reading because the text of the ordinance was not posted along with the March 24, 2006, notice. More importantly, however, I also find that mere appending of the ordinance to the March 30, 2006, public notice did not satisfy minimum due process requirements as the resulting "notice" to Plaintiff would still effectively have required it comb every line of the proposed ordinance — and, presumably, every line of every future proposed ordinance — to determine whether some provision therein happened to divest it of a protected property, irrespective of what the official "notice" advised. By contrast, I find that the probative value of additional procedural safeguards — such as individualized notice to Plaintiff adequately apprising it of the nature of the changes proposed in the overlay zone — would have been substantial as it would have permitted Plaintiff to make its case before the Council before being deprived of its protected property interest.

In reaching this conclusion, I am moreover persuaded by the Ninth Circuit's similar holding in *Harris v. County of Riverside*, 904 F.2d 497 (9th Cir. 1990), a case which addressed procedural due process requirements on broadly analogous facts.[14] In *Harris*, the Ninth Circuit

---

[14]As Defendant correctly points out, *Harris* is not perfectly on all fours with the instant case because the public notice provided in *Harris* included neither any indication — nor any way

held that due process required a county to send personal notice of proposed zoning classification

changes encompassed within a broad land use plan that affected hundreds of square miles to one

particular landowner-plaintiff where such changes "concerned a relatively small number of

persons . . . rather than the entire population."  904 F.2d at 502.  In reaching this holding, the

court observed that the landowner was "virtually the only property owner . . . who was affected

by the change," and stated that "[w]e do not believe . . . that furnishing [plaintiff] with individual

notice of the proposed change in the zoning of his property would have been either impracticable

or burdensome, given that . . . the County knew [plaintiff] would be exceptionally affected by the

change."  *Id.*, 904 F.2d at 502, 504.  Similarly, the undisputed evidence in the instant case

suggests that Ordinance 2944's effective zoning classification changes affected only eight

properties in the NW Subarea that were zoned "regional commercial."  (Pl.'s Br., SOF ¶ 21,

*admitted at* Def.'s Resp., RSOF ¶ 21.)  It follows from such evidence that at most eight

landowners would have been adversely affected by the ordinance's elimination of specific

permitted uses under this classification.[15]  On the record before me, I therefore find that

Ordinance 2944's effective zoning classifications changes within NW Subarea "concerned a

relatively small number of persons," *Harris*, 904 F.2d at 502, and that providing personal notice

to such persons would not have been "either impracticable or burdensome," *id.* at 502, 504.

---

to determine — that the broad land use plan being proposed might affect the zoning
classification of the plaintiff's land.  (*See* Def.'s Resp. at 47–48.)

[15]Defendant has adduced no evidence suggesting that the overlay zone affected permitted
uses under any *other* zoning district classifications encompassed within the NW Subarea. (*See*
Def.'s Br.; Def.'s Resp.; Def.'s Reply.)

Finally, with respect to "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail," *Mathews*, 424 U.S. at 335, I find that mailing personal notice to Plaintiff and seven similarly situated landowners would not have imposed a significant fiscal or administrative burden on Defendant. The Supreme Court has noted that "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the . . . property interests of any party . . . if its name and address are reasonably ascertainable." *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983). Defendant is already required under its Code to provide personal notice whenever proposed ordinances explicitly change zoning classifications and boundaries, (*see* Def.'s Br., Ex. A-2, Part 2 at 3 [Code] ["The Director shall send proper notice of a public hearing on a request for a change in a zoning district classification or boundary to the property owner of record and all owners of real property lying within 600 feet of the boundary of the area of the request"]), and Defendant has proffered no evidence suggesting that sending personal notice of Ordinance 2944 to the specifically affected landowners in the instant case would have imposed any significant administrative or fiscal burden.[16] (*See* Def.'s Resp. at 52.) Accordingly, I find this factor also militates in favor of finding a due process violation.

---

[16]Instead, Defendant's entire response to Plaintiff's argument on this point is repetition of its argument that it need not consider such constitutional strictures because "Colorado law allows a home rule city to establish its own procedures concerning zoning amendments." (Def.'s Resp. at 52.)

Based on the foregoing, I find that Defendant's failure to adequately apprise Plaintiff that Ordinance 2944 might deprive it of its protected property interest in the zoning classification of its land constituted a due process violation and thus establishes Defendant's liability on Plaintiff's section 1983 claim. In so holding, however, I note that my conclusion is mandated only by the specific facts before me, and that effective zoning classification changes made pursuant to overlay zones might well pass constitutional muster under different circumstances, as where competent evidence suggests that such effective zoning changes affected more than just a handful of readily ascertainable landowners. Moreover, I decline to consider at this time Plaintiff's suggestion that it is entitled to an order declaring Ordinance 2944 void as Plaintiff moved for summary judgment as to liability only pursuant to Federal Rule of Civil Procedure 56(d)(2), and because Plaintiff has offered no compelling argument that it is entitled to such relief in its briefing. (*See* Pl.'s Br. at 44–45.)

### 3. *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.    DEFENDANT's motion for summary judgment (#79) is DENIED; and

2.    PLAINTIFF'S motion for summary judgment as to liability on Plaintiff's section 1983 claim only (#77) is GRANTED.

The court will hold a Final Pretrial Conference commencing at 3:45 o'clock p.m. on June 27, 2008, in Courtroom A201 of the Alfred A. Arraj United States Courthouse, 901 19th Street, Denver, Colorado. In preparing for and participating in the conference, the parties and counsel will (1) follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of

-52-

which can be downloaded from the court's web site, specifically

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord_ins.pdf and (2) utilize

the specific template located at

http://www.cod.uscourts.gov/Documents/Judges/EWN/ewn_fin_pre_ord.wpd  These specific

web addresses should be used to insure that the proper format is observed.

Dated this 4th day of June 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge